Argued and submitted July 17, reversed and remanded with instructions to accept claim November 14, 1985

In the Matter of the Compensation of
Joji Kobayashi, Claimant.
KOBAYASHI,
*Petiti v.*
SIUSLAW CARE CENTER et al,
*Respondents.*
(82-06757; CA A34085)
709 P2d 249

Robert K. Udziela, Portland, argued the cause for petitioner. With him on the brief were Donald N. Atchison and Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland.

Allan M. Muir, Portland, argued the cause for respondents. With him on the brief were Paul R. Bocci and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Gillette, Presiding Judge, Joseph, Chief Judge, and Young, Judge.

GILLETTE, P. J.

## GILLETTE, P. J.

Claimant seeks review of a Workers' Compensation Board order which sustained the referee and found that his current clubfoot condition is not compensably related to a previous compensable injury to his knee. We reverse and remand.

Claimant, who was born in 1950 and who is of dull normal intelligence, has a history of psychiatric difficulties and hospitalizations extending back to his childhood. He was hospitalized three times at the Oregon Health Sciences University Hospital in Portland in 1978 and 1980. At these times, he had suicidal tendencies, significant paranoia and showed a volatile personality. Among his problems were drug and alcohol abuse. Apparently, treatment helped resolve those latter difficulties but did not significantly alter his underlying mental illness.

Claimant's mother is a registered nurse, who tends to dominate claimant's life and to make his decisions for him. He has lived with her most of his adult life. He is a certified nursing assistant. He has worked in several nursing homes, apparently sometimes because she found jobs in them for him. Aside from dental problems, his physical health was good before his injury.

In early 1981, claimant, his mother and step-father moved to Florence, where he got a job at the Siuslaw Care Center. On his fourth day of work, he slipped on some jello and fell, injuring his left knee. The knee was painful and swollen, but x-rays revealed no structural damage. It was the kind of injury that one would expect to resolve satisfactorily within a month or so. The injury, in fact, did not resolve as fast as expected, and claimant eventually saw orthopedists, spent time at the Callahan Center and had vocational counseling before he returned to work in October. From the beginning, his physicians saw considerable functional overlay in the failure of the knee to get better; his symptoms were well beyond the objective findings.

Claimant apparently received considerable attention from his mother and others as a result of the injury. His mother got him crutches and encouraged him to use them, although no doctor appears to have suggested that he do so.

She generally reinforced his "hurt" behavior. When he returned to work for Siuslaw Care Center under a modified job description, she encouraged him to see himself as unable to do what the job required (and what his physician released him to do) and supported his decision to quit after a couple of weeks because the employer was supposedly asking too much of him. All those who treated claimant at that time believed that he was, in fact, able to do much more than he thought he was able to do, that he needed to be weaned from relying on the injury and that his mother's reinforcement of the injury was a major obstacle.

At about the time claimant finally quit his job at the care center, he began noticing that his left foot was turning inward.[1] When he saw a chiropractor on February 12, 1982, the foot was fixed in a clubfoot position, but the chiropractor could straighten it manually. At the next visit, on February 17, the chiropractor could no longer move the foot. It has remained in that fixed position ever since, so far as claimant is consciously aware.

The contracture is not a physical condition; it is the result of claimant unconsciously focusing his psychological problems on his foot. One physician noted that when claimant put on his pants and shoes, he straightened out his foot to do so. However, there is no conscious malingering; claimant believes that his foot is immovable and is unaware of those occasions on which he unconsciously moves it.

■     It seems clear from the medical evidence that claimant learned from the attention that he received for his knee injury that he could get his psychological needs met by physical inadequacy. The improvement of his mental condition, which is probably the best it has been for years, is a direct result of his physical deformity; all of his distress has focused on his foot, leaving his mind clear—or, at least, clearer. Dr. Voiss, a psychiatrist who testified at the hearing, stated that claimant would be as disabled as he is now whether or not he had the knee injury; he might not have a clubfoot, but his psychological problems would have manifested themselves in some fashion which would have been as damaging to his

---

[1] Although he later gave earlier dates for the beginning of this occurrence, the most believable evidence is that it did not happen until November.

functioning as is the clubfoot. Voiss's testimony clearly and convincingly states the mechanism which has led to claimant's condition and is consistent with the rest of the medical record; we accept it.

■ The question that remains is whether a conversion reaction that focuses on a non-injured part of the body is compensable if the claimant "learned"—unconsciously—to express his or her psychological problems in a physical fashion as the result of a compensable injury. Claimant relies on several recent decisions of this court for the proposition that functional overlay or severe psychiatric disorder in connection with a compensable injury may be itself compensable. *See, e.g., Scheidemantel v. SAIF,* 70 Or App 552, 690 P2d 511 (1984) (psychological problem); *Chatfield v. SAIF,* 70 Or App 62, 688 P2d 434 (1984) (psychological problems); *Ferguson v. Industrial Indemnity, Co.,* 70 Or App 46, 687 P2d 1130 (1984), *rev den* 298 Or 553 (1983) (psychological problems); *Mesa v. Barker Manufacturing,* 66 Or App 161, 672 P2d 1378 (1983) (functional overlay). In all of those cases, the mechanism connecting the injury and the psychological difficulties was established. We find that it has been established here, as well.

Dr. Voiss testified:

"Q. Well, Doctor, if he hadn't injured the leg in May, 1981, would his left leg be swollen up and look like it looks today?

"A. Maybe yes, maybe no.

"* * * * *

"A. [W]hat happens is when you have this kind of situation such as Dr. Aflatooni describes as a conversion reaction, the person goes back — the event becomes a rationalization for the expression of the sense of being crippled, disabled, unable to function, unable to walk, and so forth. But, it becomes the rationalization that allows those feelings to be expressed. They're expressed, then, in that leg.

"What happens with persons with this kind of dysfunction is that emotionally they begin to operate better. * * *

"What you see in his crippling, if you will, or his distorted leg is the somatic statement that he is crippled, helpless, et cetera. * * *

"* * * * *

"Q. Doctor, what did the bumping of the knee in May, 1981, have to do with what resulted?

"* * * * *

"A. The relationship is that there is an idea that has crawled forward, so to speak, that this event serves as a rationalization for the development of these symptoms. * * *

"It's the idea that creates the symptom and the disability, it is not any kind of physical event. But, if there's a physical event around, it will be used as a rationalization."

We understand this testimony to mean that the compensable incident directly led claimant to select the bizarre focus for his disability that is his deformed foot. That establishes compensability of the foot condition.

Reversed and remanded with instructions to accept the claim.